UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                            )  COURT FILE
3M COMPANY,                 )  NO. 20-CV-1371 (ECT/KMM)
                            )
              Plaintiff,    )
       vs.                  )      **VIA ZoomGov**
                            )    **VIDEO CONFERENCE**
LEGACY MEDICAL SUPPLIES, LLC;   )
MARK ECKHARDT; CAROL ANN KORPI;  )
JOSEPH NELSON; JEREMY REBOULET;  )
and DOES 1-10, *whose true names*  )
*are largely unknown*,      )
                            )  Tuesday, July 14, 2020
              Defendants.   )  St. Paul, Minnesota
                            )  1:00 P.M.
------------------------------------------------------------


**HEARING ON**

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**
**and**
**PRELIMINARY INJUNCTION**


BEFORE THE HONORABLE ERIC C. TOSTRUD
UNITED STATES DISTRICT JUDGE


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

**A P P E A R A N C E S:**

**For the Plaintiff:**      **MASLON, LLP**
By:  THOMAS R. PACK, ESQUIRE
     JOHN THOMAS DUFFEY, ESQUIRE
     WILLIAM Z. PENTELOVITCH, ESQUIRE
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota  55402

**For defendant Legacy Medical Supplies, LLC:**

                  **SKOLNICK & JOYCE, P.A.**
By:  WILLIAM R. SKOLNICK, ESQUIRE
333 South Seventh Street - Suite 1150
Minneapolis, Minnesota  55415

**Also present:**        David Millstein, Esquire

1        (1:00 p.m.)

2                    **P R O C E E D I N G S**

3                      **IN OPEN COURT**

4            **(VIA ZoomGov VIDEO CONFERENCE)**

5            THE COURT:  Good afternoon, everyone.  Can

6    everyone hear me?

7            We are here this afternoon for a motion hearing in

8    3M Company versus Legacy Medical Supplies, LLC, and others.

9    This is Civil File Number 20-1371.

10           I'll ask counsel to note their appearances for the

11   record, please, starting with 3M.

12           MR. PACK:  Your Honor, this is Tom Pack from the

13   Maslon law firm on behalf of 3M.

14           MR. SKOLNICK:  Good afternoon, Your Honor.

15   William Skolnick on behalf of Legacy Medical Supplies, LLC.

16           MR. MILLSTEIN:  Good afternoon, Your Honor.  David

17   Millstein on behalf of Carol Ann Korpi.  We are specially

18   appearing.  We've already -- we resolved the case and don't

19   have any opposition and stipulated to the motion.  We're

20   just here informationally.

21           THE COURT:  All right.  And then we also have

22   Mr. Pentelovitch and Mr. Duffey also for 3M, if I'm correct

23   about that.

24           MR. PENTELOVITCH:  That's correct, Your Honor.

25           MR. DUFFEY:  Yes, Your Honor.  Good morning.

1          THE COURT:  All right.  Thank you.

2          Let me start this way.  I've read everything.  I

3     understand that Ms. Korpi and Mr. Nelson have reached

4     consent judgments and I've reviewed those.  When I say I've

5     reviewed everything, just to be clear, that's not just the

6     briefing, but that's if not every exhibit, most of them or,

7     you know, the vast majority of them, so I'm familiar with

8     the briefing and the record.

9          Who will be presenting on behalf of 3M?

10          MR. PACK:  I will, Your Honor.

11          THE COURT:  All right.  Mr. Pack, let me ask you,

12     is there anything or any recent -- are there any recent

13     developments that I need to be aware of?

14          MR. PACK:  Your Honor, I will say that about an

15     hour before this hearing we learned that Mr. Reboulet

16     retained counsel, and so I originally intended to argue this

17     as an unopposed motion and just point out a few particular

18     key facts that I think justify preliminary relief in this

19     matter against the remaining defendants, which are

20     Mr. Eckhardt, Legacy, and Mr. Reboulet, but I -- now

21     Mr. Reboulet and Legacy have counsel, and so that's the only

22     major recent development.

23          THE COURT:  Okay.  Mr. Skolnick, just so I'm

24     aware, you're not then just representing Legacy.  You're

25     representing Mr. Reboulet as well?

1          MR. SKOLNICK:  Good afternoon, Your Honor.

2          First of all, I want to apologize for not being in

3  a suit and tie, but I was retained a little more than an

4  hour ago and hadn't worn my suit and tie, as I didn't know I

5  was going to have a hearing today, so excuse my dress.

6          THE COURT:  That's okay.

7          MR. SKOLNICK:  Secondly, I do represent Legacy and

8  I filed a notice of appearance.  I have not filed a notice

9  of appearance on behalf of Mr. Reboulet, and it is my

10  understanding from my review of the record that there is no

11  affidavit of service upon Mr. Reboulet.

12          MR. PACK:  Your Honor, we did file an affidavit of

13  service on behalf of Mr. Reboulet yesterday and on behalf of

14  Legacy.  They were served at the same time.  Mr. Reboulet is

15  Legacy's registered agent.

16          THE COURT:  I've got the docket up, Mr. Skolnick,

17  and I do see that those affidavits --

18          MR. SKOLNICK:  I believe the affidavit of service

19  states that he was served with a summons and complaint, not

20  the TRO motion.

21          MR. PACK:  My understanding --

22          MR. SKOLNICK:  It was the other way around.  I'm

23  sorry.

24          MR. PACK:  -- with everything all at once,

25  including the briefing order, on July 2nd.

1          MR. SKOLNICK:  I can only tell you what my brief

2     review of the record is, and my understanding is that the

3     affidavit of service -- I've now been corrected by my

4     partner that it was for the TRO motion, but not the summons

5     and complaint.  That's all I could tell the Court at this

6     time.  And therefore, we would take the position that there

7     isn't a basis to grant any relief as it relates to

8     Mr. Reboulet, Legacy has been served, and I'll address that

9     when it's appropriate.

10          THE COURT:  Has Mr. Reboulet been served with the

11     summons and complaint?

12          MR. PACK:  The only way Legacy would have been

13     served with the summons and complaint is if Mr. Reboulet was

14     served with the summons and complaint, and so I don't have

15     the affidavits of service in front of me.  I can check, but

16     my understanding is that everyone has been served.

17          Furthermore, because Mr. Reboulet is Legacy's

18     principal, any relief awarded against Legacy would

19     necessarily enjoin him as well.  So it's sort of -- I think

20     we have done everything correctly, but to the extent we

21     haven't, it's really a distinction without a difference from

22     a jurisdictional standpoint.

23          MR. SKOLNICK:  Well, I disagree.

24          THE COURT:  Mr. Skolnick, let me interrupt for

25     just a second if I could.

1            I'm looking at the affidavit of service which is

2 at docket entry number 10. That indicates that the summons

3 and complaint were served upon Legacy personally in Golden

4 Valley "by handing to and leaving with Joseph Nelson, Vice

5 President Operations ... a true and correct copy thereof."

6            MR. PACK: Your Honor, I could clear up a little

7 bit of that. When we filed the lawsuit, we were not sure

8 who the parties' principals were, and on the website

9 Mr. Nelson was indicated as I believe a chief operating

10 officer, and so we did serve him with a summons and

11 complaint. We understood that to be service on Legacy, but

12 also served a summons and complaint and TRO paperwork on

13 Mr. Reboulet personally as well to sort of make sure we had

14 done everything. We also have an outstanding request for

15 service with the Secretary of State, so we have tried to go

16 at it at all angles.

17            THE COURT: All right. Well, put it this way:

18            In looking through the docket, I don't see a

19 certificate or affidavit of service of process specifically

20 on Mr. Reboulet, and the service that is indicated upon the

21 defendant Legacy Medical Supplies, the LLC, it indicated --

22 or through someone other than Mr. Reboulet, specifically

23 Mr. Nelson. So unless somebody can point me in the

24 direction of an affidavit or certificate that establishes

25 service of process on Mr. Reboulet, I will conclude for

1    purposes of this hearing that he's not been served.

2         MR. PACK:  Your Honor, I'm confident that we have

3    that certificate and I believe we filed it yesterday

4    morning, and I can point the Court at the conclusion of the

5    hearing to that, and if by some chance it was not filed, we

6    can get that filed, and I'm confident that we can resolve

7    this before you would need to issue an order.

8         THE COURT:  Okay.  Yes, the affidavit of service

9    that was filed with respect to Mr. Reboulet describes the

10   documents that were served upon him and the complaint is not

11   among them.

12        MR. PACK:  Well, Your Honor, if that is the case,

13   it is a clerical error and we can get an updated affidavit

14   of service from our process server.  Again, it was all

15   served as part and parcel of the same service on the evening

16   of July 2nd.

17        THE COURT:  Understood.  Oh, there.  No, it does

18   say.  It says "summons and complaint" right away, "Letter;

19   Summons and Complaint."  Sorry.  Trying to do these things

20   on the fly gets challenging at times, but it's important

21   that we get it right.

22        MR. PACK:  You're right, Your Honor.  And we

23   didn't --

24        THE COURT:  This is at ECF Number 31.  And I note

25   that Mr. Reboulet was served, this indicates, on July 3rd,

2020, 2:54 p.m. with the summons and complaint at 306

Trotters Court, Knightstown, Indiana.

Mr. Skolnick, any response to that?  Any concerns

about that?

MR. SKOLNICK:  It's my understanding that on

July 2nd some sheriff contacted Mr. Reboulet.  Mr. Reboulet

drove and was handed a box of documents on behalf of Legacy.

So I expected to see an affidavit of service from the

sheriff on July 2nd.  And I -- and that's why -- it's the

only information I have is that I -- I think Mr. Reboulet is

a resident of Florida.  The 306 Trotters Court was the

address given for the entity.  It is Mr. Reboulet's mother's

house, not his residence, and so I don't believe he was

served at that residence on that date with those documents.

THE COURT:  Well, I've got an affidavit in front

of me that says that he was.  I appreciate your concern or

your belief that he may not have been, but until I've got

something that's equivalent to an affidavit, I've got to go

with what I've got in the record here, and that's a sworn

affidavit by a process server that indicates or says

explicitly that he served the summons and complaint on

Mr. Reboulet personally at that address on July 3rd.

So, with that issue behind us, at least for

purposes of this hearing -- Mr. Skolnick, let me just ask

you.  Maybe this makes the most sense in trying to structure

1    where we go from here.

2         Does Legacy intend to oppose the motion for a

3    preliminary injunction?

4         MR. SKOLNICK:  Yes.

5         THE COURT:  Okay.  It's filed, no brief or any

6    pleadings in opposition to it, correct?

7         MR. SKOLNICK:  It's my -- no, I have not filed

8    anything having just been retained and it's my understanding

9    no one else has submitted any papers in opposition.

10        THE COURT:  Right.  So just for purposes of a

11   clear record today, then Legacy's response or opposition

12   would be any argument that you make here today and that's

13   it, correct?

14        MR. SKOLNICK:  That is correct.

15        THE COURT:  Okay.  Mr. Pack, since you're the

16   moving party, let's hear from you first here keeping in mind

17   again that I've read everything.

18        MR. PACK:  Yes, Your Honor, and I'll keep it brief

19   because I don't think I need to cite chapter and verse of

20   the case law to you.

21        But 3M's filed over a dozen of these lawsuits

22   around the country because so many people are attempting to

23   profit from the COVID-19 pandemic, and it's 3M's position

24   that because there can be no harm to Defendants by issuing

25   the relief it seeks in the form of a proposed TRO order, it

1    should be issued because the order 3M seeks merely enjoins

2    illegal conduct.

3          You know, I'm sure the Court is aware that 3M

4    manufactures N95 respirators and is the world's largest

5    manufacturer of these respirators, and, you know, these are

6    a critical tool to protect healthcare workers, but because

7    no one foresaw the global pandemic, supply is severely

8    constrained.  And in my own family I have physicians who are

9    having to reuse these single-use masks again and again

10   because there simply aren't enough of them.  And healthcare

11   providers are desperate for these respirators and the

12   pandemic has created just the sort of black or gray market

13   for the resale of these respirators at enormous markups.

14   And while this is immoral, moreover it's illegal.  And using

15   3M's trademarks, goodwill, and alleging connections to 3M

16   dilutes its trademarks and violates various deceptive trade

17   practices laws which are analyzed for purposes of a TRO and

18   a preliminary injunction under the same standard.

19          And that is exactly what the defendants in this

20   matter are attempting.  Indeed, Mr. Reboulet, the apparent

21   principal of Legacy Medical Supplies, asked me in an email

22   earlier in this litigation when he was asked to waive

23   service and then failed to do so that he wanted to clear up

24   this, quote-unquote, misunderstanding apparently so Legacy

25   can continue to trade on 3M's name and goodwill to play

1  matchmaker between buyers and sellers of N95 respirators at

2  an enormous markup, and that email is particularly at

3  Exhibit 18 to the Duffey declaration.

4      And while I learned about an hour before this

5  hearing that Mr. Reboulet has retained counsel and is

6  interested in resolving the matter, we have no assurance

7  that Mr. Reboulet and Legacy will not go back to the

8  business model that they based the whole company on and are

9  therefore seeking preliminary relief from the Court.

10     And I do want to clear up, as a preliminary

11  matter, we have reached settlements, as we indicated, with

12  Mr. Nelson and Ms. Korpi, and to the extent the Court has no

13  concern with the consent judgments that we submitted

14  already, then we don't seek preliminary relief against them;

15  however, we do seek that preliminary relief if the Court has

16  any issue with or does not expect to issue the consent

17  judgments that we filed.

18     Substantively, Your Honor, I don't think this is a

19  close case at all.  The Court understands the law.  Six

20  other TROs have been issued in similar cases and here the

21  facts are at least as egregious, if not more egregious, than

22  those other cases.  And I want to highlight just three

23  particular facts which I think demonstrate the harm 3M is

24  experiencing with regard to its trademarks, brand and

25  goodwill, and then I don't need to explain how the law

1    justifies them.  I'm sure the Court is very familiar with

2    that.

3           First, Mr. Reboulet and Ms. Korpi claimed a

4    relationship with Nick Gangestad, 3M's CFO.  They made this

5    claim to an attorney here in Minnesota who they sought to

6    retain in connection with what we view as fraud, and that

7    attorney was sufficiently concerned with what he heard that

8    he waived confidentiality through ethical exceptions to that

9    rule, contacted the FBI, and they passed on that information

10   to 3M.  That information is contained in the Van Heyst

11   declaration.  Legacy also claims connections to 3M's

12   attorneys in its marketing documentation and on its website.

13   So, every time Legacy is contacting a new potential buyer

14   for 3M N95 respirators, it's alleging a connection with 3M,

15   and that is a dilution of 3M's goodwill and trademarks.

16          The second fact, briefly, Your Honor, is that

17   Mr. Reboulet himself called 3M's customer service line

18   seeking help in vetting, quote-unquote, brokers in order to

19   perpetrate this fraud.  He said he had $160 billion in

20   escrow for the purchase of 47 billion respirators for 183

21   hospitals, which represents, if you average that out, about

22   a 250 percent markup over 3M's list price, which has not

23   increased since the beginning of the pandemic.  He didn't

24   want to speak to the fraud hotline, but instead sought to

25   speak to someone in production and stock availability.

1          Importantly, that's several decades' worth of 3M's

2     production capacity that Mr. Reboulet claimed to have access

3     to, and the notion that Mr. Reboulet would represent

4     availability to hospitals during a pandemic at a markup is,

5     frankly, reprehensible.  And this is all detailed in the

6     Gruber declaration which is attached to our TRO briefing.

7     There's just no way Legacy has those respirators, but they

8     continue to in a third instance market access to those

9     respirators.

10          And the third instance is when Legacy sought to

11     sell 250 million respirators to an entity called Safe Harbor

12     for a large markup, which would then probably resell these

13     respirators to other entities at an even larger markup.

14     This is detailed in the Smith declaration.  Legacy certainly

15     did not have access to what amounts to five months of 3M's

16     now increased respirator capacity.

17          And these three instances, which are what 3M has

18     uncovered from its investigation to date alone, clearly

19     implicate an attempt to use 3M's brand, reputation and

20     goodwill to deceive consumers during a pandemic.  Even if

21     Mr. Reboulet had legitimate access to 3M respirators, it

22     would not have come through -- pardon me.  If Mr. Reboulet

23     had access to 3M respirators at all, it would not have come

24     through legitimate channels, and he absolutely has no access

25     to 3M executives and attorneys in connection with this

1    business.  So, Legacy's attempt to profit off the

2    desperation of a pandemic is awful.

3         I don't need to belabor the standard and relate

4    the case law for you, although I'm happy to answer any

5    questions the Court has about how this case fits into

6    existing law.

7         I do want to focus on one area, though, which is

8    the scope of their requested relief.  The proposed TRO

9    order, along with a proposed preliminary injunction order,

10   along with the consent judgments that we have filed in this

11   case simply enjoins the use of 3M's marks, and it enjoins

12   false statements and enjoins claims of affiliation with 3M.

13   I understand Mr. Skolnick was recently retained, but I just

14   don't see any possible argument against enjoining illegal

15   conduct.  The standard for preliminary relief is met and

16   there's no harm to Legacy or Mr. Reboulet or Mr. Eckhardt,

17   and there just can't be any harm from being required to act

18   lawfully.

19        So, our other arguments and citation to law are

20   contained in our brief and I'm happy to answer any questions

21   the Court has unless you -- if you don't have any, I'll

22   stop.

23        THE COURT:  I have questions regarding the

24   proposed order for a preliminary injunction.

25        MR. PACK:  Yes, Your Honor.

1          THE COURT:  If I could sort of run through those

2     if I could.

3          First, the order would enjoin not just the

4     defendants, but all persons and entities, business

5     organizations and the like, quote, "in active concert and

6     participation with the defendants," and I'm wondering if

7     that "active concert and participation" is a term of art,

8     and if it is, what does it mean?

9          MR. PACK:  Your Honor, I don't think it's a term

10    of art.  I think it's meant to encompass sort of the Doe

11    defendant idea of affiliated entities.

12          For example, Mr. Reboulet has, we understand from

13    the public record, another entity, a holding company, for --

14    his entity is called Legacy.  I could find the exact entity,

15    but the purpose there is to ensure that he doesn't simply

16    change up the LLC and then proceed with the conduct.

17          THE COURT:  All right.  I read that and sort of

18    thought of a number of hypotheticals of folks who might be

19    working with Legacy.

20          MR. PACK:  Another example, Your Honor, that comes

21    to mind is we understand Ms. Korpi has a consulting company

22    she works through, and so we wouldn't want to see the same

23    conduct occur through that LLC.

24          THE COURT:  I'm fine with 3M not posting a bond if

25    I enter the injunction.  In looking through other orders and

in looking through Eighth Circuit law, my understanding of

that is I need to justify that decision beyond just

equitable powers and discretion.  It seems to me that one

legal reason I'm permitted not to require a plaintiff in

this situation to post a bond is its financial condition.

Is that your understanding as well?  I saw Judge Prescott

did that in her order.

MR. PACK:  Yes, Your Honor, and we're -- that's

fine.  I mean, 3M can obviously pay any damages that might

result, even though it's hard to conceive of any damages

resulting from this injunction.

THE COURT:  Okay.  And then with regard to

paragraph 4 of the proposed order, it required the

defendants to within seven days essentially report

compliance, and that's not something I'm accustomed to

seeing in a preliminary injunction.  I mean, either they're

in compliance or not, and if they're not in compliance, you

come back and you ask for contempt if the injunction is

entered.

MR. PACK:  Oh, at the very end?

THE COURT:  Yes, paragraph 4, and then I'm going

to have a question about paragraph 5 too, but I guess I'm

not -- I haven't seen a paragraph like paragraph 4 entered

before and I'm wondering what particular purpose it would

serve here beyond just entry of the preliminary injunction

itself, right?  If they're not in compliance, they're not in

compliance, you come to me and you tell me that and we've

got a possible contempt issue on our hands.

MR. PACK:  Your Honor, I think the purpose from

3M's perspective is that a lot of this is happening outside

of the public view and it will be difficult for 3M to --

particularly if Defendants are trying to hide it -- to

ascertain whether or not they are complying, and so we would

ask that there be an affirmative requirement that they come

back and confirm that they're complying.  So it just seems

very easy for us to imagine scenarios in which they're not

complying, but we can't tell until another fraud hotline tip

hits the FBI's telephone.

THE COURT:  Among the form orders that -- sorry,

not form -- entered orders that you sent to me, has any

other judge included that term in one of the other orders?

MR. PACK:  I'm not aware of any, Your Honor.

THE COURT:  Okay.  The last paragraph says that I

retain jurisdiction to hear and determine all matters.  I

don't think that paragraph is necessary since the case isn't

over with.  I get that it's necessary with respect to the

consent decrees, but if I'm entering a preliminary

injunction, this case is still ongoing.  It's not necessary,

I don't think, to include a sentence that says I retain

jurisdiction when the case is in fact still pending.  Does

that make sense or am I missing something there?

MR. PACK:  No, Your Honor, that doesn't make sense to us.

THE COURT:  Okay.  So I'll take paragraph 5 out then if the order is entered.  I'll think about paragraph 4 again if the preliminary injunction is entered.

All right.  Anything further, Mr. Peck?

MR. PECK:  Yes.  I had one correction to a statement about "active concert or participation" being a term of art.  It's actually contained in Rule 65.  I misspoke earlier and I apologize for that.  The order binds -- and it's Rule 65(d)(2)(C).  An order can bind other people who are in active concert or participation with anyone described in the order, and I envision that including the other LLCs, but it is a legal term as well.

THE COURT:  Great.  All right.

Mr. Skolnick, let's go to you.

MR. SKOLNICK:  Well, based on my great knowledge of this case that I have acquired in the last hour and a half, there were a couple things that did strike me.

Number one, Legacy never said they were a distributor of 3M products.

Number two, there is no evidence submitted that Legacy put 3M's mark on any products.

MR. PACK:  I could address both of those, Your

1    Honor, if you'd like.

2           THE COURT:  No, let's wait till Mr. Skolnick's

3    done.

4           MR. PACK:  I apologize.

5           MR. SKOLNICK:  And in fact, I don't believe

6    there's any evidence that they sold any 3M product or

7    claimed to sell any 3M product that has actually been

8    consummated.

9           So, when you're looking at this, we have -- you

10   know, Mr. Pack mentioned this affidavit from this unknown

11   lawyer, which is hearsay.  It's in the Van Heyst affidavit.

12   And the fact that they've been successful against others

13   based on those facts in those other cases has no bearing

14   here.  We do have Legacy, who was attempting to broker and

15   help match buyers and sellers.  They went through and

16   contacted, it's my understanding, licensed and authorized 3M

17   distributors.  So it wasn't that Legacy was out there

18   saying, "We're a 3M distributor."  They didn't.  That's my

19   understanding.

20          And based on the balance of harms, what they have

21   asked is to put my client out of business, whereas the harm

22   to 3M, although they say it's irreparable, the truth of the

23   matter is that 3M will not suffer any harm if we allow this

24   case to proceed without a preliminary injunction.  As they

25   say, we have enough -- 3M is big enough and financially

secure enough they don't need to post a bond.  My client has

sold none, not one item that they have come forward with,

that was either a 3M product or a fake 3M product.  So when

you weigh that situation, I believe it does weigh in favor

of my client.

Now, when I was first contacted I did contact

Mr. Pack, and I was aware this morning that Ms. Korpi and

Mr. Nelson had reached consent judgments and I have those

available for my review and I've reviewed them.  My

understanding is there's a settlement agreement between

those parties and I asked to cut to the quick and say, "Show

them to me.  Maybe we can eliminate the need for this

hearing," and Mr. Pack said he was busy preparing for the

hearing, which I understand.  So my plan and where we go

from here is to obviously explore that avenue of is there a

resolution that can be reached before we expend a lot of the

Court's and everyone else's resources.

And that would be, Your Honor, what I would

propose happen.  That's it.  I've not submitted anything and

I don't have anything more to add at the moment.

THE COURT:  Thank you, Mr. Skolnick.

Mr. Pack?

MR. PACK:  Yes, Your Honor.

Well, first of all, Legacy did represent to an

intermediary in an attempted purchase between Legacy and

1    Safe Harbor that it was an authorized distributor, and that

2    is detailed in the declaration of Stuart Tseng, T-S-E-N-G,

3    Exhibit 1 at page 5, lines 11 through 16.

4          Second, Mr. Skolnick said there's no evidence that

5    Legacy ever used 3M's marks.  Well, the letters "3" and "M"

6    are a registered trademark for 3M, and so those were used on

7    its website, on the letters of intent, on the proposed

8    agreements that we submitted, and in a number of informal

9    statements in connection with the sales we have detailed.

10         Finally, Mr. Skolnick's point about how Legacy has

11   never actually sold a mask, I mean, I think initially it's

12   because Legacy has never had access to any masks, but

13   legally that's sort of beside the point.  When there is

14   trademark infringement in the Eighth Circuit, there is a

15   presumption of irreparable harm and infringement only

16   requires an offer for sale.  It doesn't require a sale.  And

17   so Legacy's attempt to sell 3M products using 3M's name

18   creates a presumption of irreparable harm that tips the

19   balance in 3M's favor.

20         And finally, I was not able to provide and I'm

21   still not able to provide to Mr. Skolnick the confidential

22   settlement agreement between Ms. Korpi and 3M and Mr. Nelson

23   and 3M, but I did outline the broad terms of it, and I

24   think, you know, if the Court enters the TRO, we're happy to

25   explore resolution.  I also noted that I wasn't authorized

1   to make any offer of any specific terms on the fly an hour

2   before the TRO hearing.

3          THE COURT:  Thank you.

4          Mr. Skolnick, anything further?  I'll give you the

5   last word here if you like.

6          MR. SKOLNICK:  Thank you, Your Honor.

7          Number one, the transcript that he's talking about

8   is from a third party saying that something was said by my

9   client.  It's hearsay, it's unsupported.  There's nothing

10  that my client published that said where they claim to be a

11  3M distributor.

12         The second item is, Mr. Pack keeps asking the

13  Court and just asked the Court about a TRO.  My client is

14  not arguing that because of my recent retention.  If the

15  Court were to order a TRO and give us some time to

16  investigate this matter, we could come back.  It's the

17  preliminary hearing and injunction that Legacy is objecting

18  to.

19         THE COURT:  Help me out there.  What do you see as

20  the dispositive difference between entering a TRO and a

21  preliminary injunction, just the 10-day duration or 14-day

22  duration of a TRO?

23         MR. SKOLNICK:  That would give counsel, myself, an

24  opportunity and my client an opportunity to do a

25  thorough -- well, to do an investigation as to whether or

1    not some of these allegations are true and whether or not it

2    will bear on what happens at the conclusion.  The

3    preliminary injunction says this stops them throughout the

4    pendency of the case.  And so it would allow us to put some

5    evidence before the Court when we go from a TRO to a

6    preliminary injunction, whereas right now, obviously, my

7    client not having counsel did not submit anything.  We would

8    like the opportunity to gather some evidence, present it to

9    the Court, let the Court decide whether a preliminary

10   injunction after it sees some of the evidence is

11   appropriate.

12        Thank you.

13        THE COURT:  Mr. Pack, what do you say about that?

14        MR. PACK:  Your Honor, we still would like a

15   preliminary injunction, but I assumed that would be as

16   indicated I believe in our proposed order a later thing as

17   well.  And so it seems like there's no longer any question

18   about the TRO and we ask that the Court set a briefing

19   schedule for the preliminary injunction and that we will

20   continue to pursue its issuance on that briefing schedule as

21   indicated by our proposed TRO.

22        Your Honor, I also would like an expedited

23   discovery schedule.  If we're going to engage in active

24   attempts to figure out what's actually happening here

25   between the parties, we would like not only to have

1    Mr. Skolnick submit evidence that he has, but also produce

2    evidence to 3M that is going to be responsive to any

3    discovery request that would be issued in this matter.

4         THE COURT:  Well, all right.  I hadn't really

5    thought about -- hadn't really thought about the distinction

6    between a TRO and a preliminary injunction meaning very much

7    here given the way this thing had been set up prior to the

8    hearing, or presented, I should say.

9         But since the motion for a temporary restraining

10   order -- Mr. Skolnick, what I hear you saying is your

11   clients are not opposed to the entry of a temporary

12   restraining order.

13        MR. SKOLNICK:  That is correct.

14        THE COURT:  Okay.  Well, that makes things easy

15   then.  I will -- at least for the time being and for me.  I

16   don't know how much easier it's going to make it for you

17   all, but it makes it easier for me.

18        I will grant the motion for a temporary

19   restraining order.  I'll enter it pursuant to Rule 65.  I'll

20   order that that temporary restraining expire not later than

21   14 days from its entry, which will be, just to give

22   everybody a heads-up on this, July 28th.

23        I take it you all then will be in discussions

24   between now and then about what makes the most sense in

25   terms of where the case goes from there, and I can imagine

1 that going a number of different directions. You may decide

2 that a resolution makes the most sense, you may decide that

3 expedited discovery makes the most sense, but let's cross

4 that bridge when we come to it.

5 As part of the order, what I'll do is also ask the

6 parties to give me a status update on -- do you want Friday

7 the 24th or Monday the 27th?

8 MR. SKOLNICK: Friday the 24th would work better

9 for me, Your Honor.

10 THE COURT: Mr. Pack?

11 MR. PACK: That would work for us, Your Honor.

12 Would you consider any form of expedited discovery in the

13 next 14 days as we attempt to get to the bottom of what was

14 actually done and what was said?

15 THE COURT: Not today. I'm going to leave that up

16 to you all to either agree to or not. I mean, it seems to

17 me that the costs associated with expedited discovery are a

18 reason to reach a resolution. So I'm not going to order

19 that today, but if we get to the 28th and we don't have

20 that, and if the briefing on the motion for a preliminary

21 injunction suggests that something like that is helpful or

22 might be helpful, then I'd order it then. Frankly, on the

23 evidence that's presented now, it seems to me there isn't a

24 lot more that's necessary from 3M's side.

25 All right. Just to close the loop, I'll also say

for purposes of the record that I find the ***Dataphase***
elements here for purposes of a temporary restraining order
are satisfied.  I think that 3M's established a likelihood
of success on the merits.  I think that it's shown
irreparable harm.  I think it would be guesswork and
speculative as to try to determine a damages amount relative
to the alleged conduct on the record that's created here
with respect to this motion.  I think the balance of harms
weighs in favor of 3M.

Mr. Skolnick, I appreciate your arguments and the
fact that you were retained just an hour before the hearing.
The one thing I would observe about balance of harms is
this:

Both the temporary restraining order and the
preliminary injunction order that have been proposed would
restrain Legacy from selling 3M masks and engaging in the
distribution, advertising, and promotion of 3M masks, which
I gather Legacy is saying it's something it's not doing or
doesn't want to do, certainly hasn't done successfully, and
the rest of the order really just relates to prohibiting
false representations and other conduct that would seem to
violate the law.  So I don't see as how that kind of
temporary restraining order or preliminary injunction would
put your client out of business, so I find the balance of
the harms weighs in favor of 3M.

1            And certainly I think if you're balancing public

2      interest here, it also weighs in favor of 3M on the record

3      as it stands now given profiteering and opportunistic sorts

4      of allegations and related evidence that have been submitted

5      in the era of a pandemic.

6            So, I will enter an order today granting the

7      motion for a temporary restraining order.  It will not be

8      exactly the same as the order 3M submitted.  It will contain

9      the changes to delete paragraphs 4 and 5 of the proposed

10     order and we'll make a couple of other tweaks, but that's

11     about it.

12            Mr. Pack, any questions?

13            MR. PACK:  Yes, Your Honor.  Did you intend to

14     enter the consent judgments we submitted?

15            THE COURT:  Oh, I'm sorry.  Yes, and I find that

16     those are both reasonable and supported by the record as

17     well, so I have no questions about that and certainly agree

18     that those are substantively and procedurally fair,

19     reasonable, and consistent with the governing law as well,

20     so I will enter those as well.

21            MR. PACK:  Thank you, Your Honor.

22            THE COURT:  I will dismiss those two defendants

23     from the case then, though I will retain jurisdiction over

24     those two separate consent decrees.

25            MR. PACK:  Thank you.

1          THE COURT:  Anything further, Mr. Pack?

2          MR. PACK:  Not from me, Your Honor.

3          THE COURT:  Mr. Skolnick, anything further?

4          MR. SKOLNICK:  No, Your Honor.

5          THE COURT:  All right.  I will look forward to

6    hearing from everybody by the close of business, 5:00 p.m.,

7    on Friday, July 24th as to where everybody's at and the need

8    for further proceedings relative to the motion for a

9    preliminary injunction.

10          Thanks, everyone.  We'll stand adjourned.

11          MR. PACK:  Thank you.

12               (Proceedings concluded at 1:46 p.m.)

13                    *      *      *      *

14

15

16

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T E**


I, **TIMOTHY J. WILLETTE,** Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.



*/s/ Timothy J. Willette*


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224